**UNITED STATES of America,**
**Plaintiff,**

v.

**Robert P. ANDERSON, N. B. Burt, Ralph E. Crandell, E. L. Harmon, Karl Lagnefors, Earl W. Senn, Defendants.**

**Civ. A. No. 7860.**

United States District Court
D. Colorado.

March 3, 1964.

See also D.C., 34 F.R.D. 518.

Lawrence M. Henry, U. S. Atty., Arthur L. Fine, Asst. U. S. Atty., for Dist. of Colorado, Denver, Colo., for plaintiff.

Benjamin E. Sweet, Denver, Colo., for defendants Anderson, Burt, Crandell and Senn.

DOYLE, District Judge.

The United States here seeks to recover a deficiency from defendants who were individual guarantors of a loan which was made by the United States Small Business Administration, hereafter called the "S.B.A." The complaint alleges that on September 26, 1957, the U. S. Durox Corporation of Colorado executed a promissory note to the First National Bank of Englewood in the amount of $250,000.00 with six per cent. interest; that as part of the security for the note the defendants executed the mentioned guaranties which were unconditional; that the corporation thereafter defaulted; that the Bank assigned the note and collateral security to plaintiff. Claim is for the sum of $113,778.87, this sum allegedly representing principal and interest to the date of filing. An affidavit offered in connection with the present trial demands a total of $121,439.26 as of February 10, 1964.

The facts as revealed by the hundreds of documents submitted are not disputed. The disputes pertain to the inferences and legal conclusions which validly arise from an extensive record made in connection with proceedings under Chapter X of the Bankruptcy Act, Docket No. 22895 (in Bankruptcy) in this Court. There is no dispute concerning the execution of the note and the guaranties nor concerning the default. The dispute pertains to

whether the defendants can be held for the amounts claimed, the bulk of which results from payment by S.B.A. of the costs and expenses of administering the Chapter X proceedings. Inasmuch as the controversies are thus limited it is deemed unnecessary to render formal findings and conclusions. The significant facts will be here related and this opinion will contain findings insofar as the same are necessary. Rule 52, Federal Rules of Civil Procedure.

The sum evidenced by the note was paid to U. S. Durox by the First National Bank of Englewood in two installments. The first installment of $218,000.00 was paid on October 4, 1957, and the balance of $32,000.00 was paid on December 26, 1957. There was a participation agreement whereby S.B.A. paid ninety per cent. of each installment.

The note, insofar as here pertinent, contains acceleration provisions together with broad provisions for sale of the collateral to satisfy the principal debt. It declares:

"Upon the nonpayment of the indebtedness, or any part thereof, when due, whether by acceleration or otherwise, Payee is empowered to sell, assign, and deliver the whole or any part of the Collateral at public or private sale, without demand, advertisement or notice of the time or place of sale or of any adjournment thereof, which are hereby expressly waived. After deducting all expenses incidental to or arising from such sale or sales, Payee may apply the residue of the proceeds thereof to the payment of the Indebtedness, as it shall deem proper, returning the excess, if any to the undersigned."

Furthermore, the maker of the note agreed to pay expenses as follows:

"The undersigned agrees to take all necessary steps to administer, supervise, preserve, and protect the Collateral; and regardless of any action by Payee, there shall be no duty upon Payee in this respect. The undersigned shall pay all expenses of any nature, whether incurred in or out of court, and whether incurred before or after this Note shall become due at its maturity date or otherwise, including but not limited to reasonable attorney's fees and costs, which Payee may deem necessary or proper in connection with the satisfaction of the Indebtedness or the administration, supervision, preservation, protection (including, but not limited to, the maintenance of adequate insurance) of or the realization upon the Collateral. Payee is authorized to pay at any time and from time to time any or all of such expenses, add the amount of such payment to the amount of the Indebtedness, and charge interest thereon at the rate specified herein with respect to the principal amount of this Note."

The term "indebtedness" is defined in the note as "the indebtedness evidenced by this Note, including principal, interest, and expenses, whether contingent, now due or hereafter to become due and whether heretofore or contemporaneously herewith or hereafter contracted."

The provisions of the guaranties which S.B.A. considers relevant are as follows:

"* * * the bank undersigned hereby unconditionally guarantees to Bank, its successors and assigns, the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, of the principal of and interest on and all other sums payable, or stated to be payable, with respect to the note of the Debtor, made by the Debtor to Bank, dated Sept. 26, 1957, in the principal amount of $250,000.00—, with interest at the rate of –6– percent per annum.

"* * * In case the Debtor shall fail to pay all or any part of the Liabilities when due, whether by acceleration or otherwise, according to the terms of said note, the undersigned, immediately upon the written demand of Bank, will pay to

Bank the amount due and unpaid by the Debtor as aforesaid, in like manner as if such amount constituted the direct and primary obligation of the undersigned."

When Durox subsequently defaulted on its payments under the note, S.B.A. gave notice on February 6, 1959 that the entire sum was due and payable under the acceleration clause. At that time the principal amount was $200,595.16. There was in addition $7,355.16 interest. The defendants, who had been directors of Durox, were not then in control of its affairs. Through its then officers, Durox filed a petition seeking reorganization under Chapter X of the Bankruptcy Act, alleging the threatened foreclosure. An order was entered approving the petition and enjoining the initiation or continuation of legal actions. A trustee was appointed, and he in turn appointed an attorney and accountants. Other personnel were authorized. The S.B.A. and also the defendants opposed the Chapter X proceedings. The Securities Exchange Commission entered its appearance and supported the reorganization proceedings, finally approving the plan which was subsequently adopted.

On December 15, 1959 a plan of reorganization was filed. This called for the liquidation and distribution of the assets. On this same date, the defendants filed a recommendation calling for immediate liquidation. Later, on March 24, 1960, an amended plan, which in substance was the same as the original one, was filed. This called for orderly distribution of the assets according to priorities established by the plan. It also provided that the payment of costs and expenses of administration and other allowances "made by the judge in this proceeding shall be paid in cash by the Trustee out of the assets in his hands in an amount and manner as the judge shall direct."

Briefs were filed by the S.B.A. and by the defendants here opposing the plan, and the question whether the plan was feasible was submitted to the Referee in Bankruptcy. He in turn recommended adoption. Subsequently, on September 13, 1960, the amended plan was approved by the Court, and later, on December 21, 1960, was confirmed. Efforts to negotiate a sale of the assets were not successful, necessitating the holding of a public sale on August 16, 1961. S.B.A.'s bid of $250,000.00 cash was the highest. The legal consequences of the facts surrounding the approval of S.B.A.'s bid are crucial in this determination.

S.B.A. subsequently, on November 9, 1961, petitioned the Court seeking permission to substitute the amount of the indebtedness (secured by mortgage lien) for its cash bid. The conditions which then existed must be noted. The amount of the bid was substantially lower than the appraised value. Sale had been authorized at seventy-five per cent. of the appraised value or at a figure of $354,900.00, and, consequently, Court approval of the $250,000.00 bid was essential. The request to substitute the amount of the indebtedness was also different from the bid and this request needed approval. The amount of the indebtedness plus interest was then estimated to be roughly $242,000.00, and thus the only cash which S.B.A. proposed to pay was $8,000.00 "plus any additional amounts found by this Court to be reasonable charges incurred by the Trustee and his attorney and others for the protection and benefit of the security interest of S.B.A. in the properties and assets of Durox."

At a hearing on November 16, 1961, the Trustee opposed this substitution pointing out that under this procedure there would not be cash for the payment of costs and expenses and further that the bid had offered cash. Apparently, the purpose of the petition was to avoid the payment of interest by S.B.A. on the amount of the purchase price in view of the fact that its first lien would be transferred to the proceeds. It is also noteworthy that the petition did not offer to pay all costs and expenses but only those found by the court to be reasonable charges for the protection and benefit of the security interest of the S.B.A. The

Court rejected the petition, and thereupon S.B.A. amended its petition offering to pay into court sufficient cash to pay awards of expenses and utilizing its indebtedness (to a lesser extent than under its other proposal) to pay the balance. On this basis the petition was accepted by Chief Judge Arraj. The S.B.A. takes the position that it was required to pay this additional cash. It is true that Judge Arraj rejected the offer to pay only enough cash as was necessary to make up the difference between the indebtedness and the amount of the bid. It is also important to note, however, that the offer to pay additional cash—sufficient to defray all costs and expenses—was an alternative proposal on the part of S.B.A. Subsequent to this (on December 29, 1961) the Court awarded fees and expenses. S.B.A. then sought leave to appeal the award of fees, alleging in its petition to the Court of Appeals that the trustee and his attorney had not protected its interest and that the fees were excessive. This petition was denied.

The sale of the Durox properties was confirmed on February 8, 1962. The order of confirmation directed payment by S.B.A. of a sum equal to the accrued and estimated future costs of administration, including "fees and allowances and claims having priority over the claim of S.B.A., which amount is estimated to be One Hundred Twenty-Four Thousand Five Hundred Dollars ($124,500.00)." The amount was paid in. The estimate proved somewhat high and thereafter S.B.A. received back the sum of $12,649.-69.[1]

S.B.A. takes the position that since only $138,149.69 ($250,000.00 − $124,-500.00 + $12,649.69) was credited against the alleged indebtedness on the note of $243,810.30 there remained an unsatisfied balance as of August 16, 1961, of $105,660.61, adding interest to date, giving a total of $121,439.26. The instant action seeking to recover the mentioned balance from the defendants as guarantors was commenced January 11, 1963. Whether S.B.A. can recover would appear to depend on whether the costs and expenses of administration of a Chapter X proceeding are properly to be attributable to the principal indebtedness so as to be recoverable against the guarantors of the loan.

## I.

S.B.A.'s legal position is based on the proposition that regardless whether such costs and expenses are to be so charged against guarantors, the mortgage debt was credited only to the extent of $138,-149.69 as a result of all of the proceedings. Hence, argues S.B.A., there remains an unpaid deficiency on the loan and therefore the defendants as guarantors are liable. Defendants take the position that the purchase price paid by S.B.A. for the property amounted to $242,000.00 plus the amount of cash paid in, $111,850.31, to defray the costs and expenses of administration, or a total of $353,850.31. So viewed, the mortgage debt in its entirety would be discharged and the defendants in turn would be discharged. Neither the construction given to the transaction by S.B.A. nor that given by the defendants is realistic. S.B.A. offered $250,000.00 cash for the properties of Durox. S.B.A.'s subsequent offer to pay only $8,000.00 in cash and the balance in lien did not change this fact or its legal consequence. The purpose of this was to avoid obtaining cash and paying interest. This proposal did bring into focus the issue whether S.B.A. was to be charged with the costs and expenses of the Chapter X proceedings. By refusing S.B.A.'s first proposal Judge Arraj concluded either that S.B.A., although a secured creditor, was chargeable with these costs, or that these administrative creditors had a priority superior to the secured position of S.B.A. To accept S.B.A.'s position would require a holding that the net selling price was reduced to the extent of the amount of

---

[1.] Of the amount paid in, the sum of $36,633.71 was attributable to trustee's fee and attorneys' fees.

cash paid in for payment of costs and expenses. There is no evidence that this occurred. The evidence is that the costs and expenses were assessed over and above the sale price. The manner of debiting and crediting by S.B.A. (in contemplation of this suit) is neither binding nor even persuasive as to the real nature of the transaction. Let us suppose that the original bid had been carried out and S.B.A. had paid $250,000.00 in cash to the Chapter X Trustee, and the Court had then determined that S.B.A. had to pay the costs before it could exercise its priority in respect to the proceeds. It could not then be argued that the sale price was either reduced or increased; nor could it be contended that the debt evidenced by the note was not completely satisfied. The sale as it actually occurred, though somewhat different in form, did not differ in substance from that shown by the example.

## II.

■ Both S.B.A. and the defendants argue that it was inappropriate to assess the costs to S.B.A. or to subordinate its secured claim to costs and expenses and thus argue that the transaction is not to be read as we outline it above. This explains why S.B.A. in effect argues that the debt remains to the extent that cash was paid in by it, and why defendants argue that S.B.A. actually agreed to pay an increased price (to the extent of costs) for the property. It does not appear, however, that in a Chapter X proceeding the plan can not provide for the payment of costs and expenses by secured creditors, or for the subordination of secured creditors to claims for administration.

■ Under former section 77B of the Bankruptcy Act, secured assets could only be charged with expenses attributable to activities which had benefitted the secured creditors, or to which they had expressly or impliedly consented. 6 Collier, Bankruptcy ¶ 13.14(2) at 4575 (14th ed. 1947). In Chapter X proceedings, however, Section 246 of the Bankruptcy Act (Title 11 U.S.C. § 646) empowers

the judge, upon termination of the proceedings, to determine compensation for services rendered and reimbursement for expenses incurred therein, and to "make provision for the payment thereof, and for the payment of all proper costs and expenses incurred by officers in such proceedings." Moreover, it is recognized that secured creditors are within the scope of Chapter X proceedings, and that it is proper to charge secured creditors as well as unsecured creditors in the interests of reorganization—that it is often unjust to impose the entire burden of meeting expenses on general creditors. Cf. Rubin, Allocation of Reorganization Expenses, 51 Yale L.J. 418 (1942). Indeed, some cases have approved the charging of reorganization expenses against all assets of the estate, both secured and unsecured. In re Gage County Electric Co., CCH Bankr.Serv. ¶ 52,602 (D.Neb. 1940); Matter of Northern Marble Corp., 51 F.Supp. 26 (D.Del.1943); In re Riddlesburg Mining Company, 224 F.2d 834 (3rd Cir. 1955). Where reorganization expenses have been charged in part against secured assets, however, the secured creditor commonly either did not object to the proceedings and would have benefitted therefrom, In re Alaska Plywood Corp., 166 F. 423, 17 Alaska 738 (D.Alaska 1958); or would have benefitted from the proceedings even though it opposed them, In re Rice Leghorn Farm, 113 F.Supp. 903 (W.D.Mo.1953). In more than a few cases, on the other hand, courts have refused to charge the expenses of an abortive reorganization against secured assets where it did not appear that the expenses were directly related to preservation of the value of the secured assets—from which the mortgagee benefitted or might reasonably expect to benefit. United States v. Henderson, 274 F.2d 419 (5th Cir. 1959); Silver State Savings and Loan Ass'n. v. Young, 252 F.2d 236 (9th Cir. 1958); Matter of Freeport Standard Dairy Corp., 124 F.2d 783 (7th Cir. 1941); Matter of Franklin Garden Apartments, Inc., 124 F.2d 451 (2nd Cir. 1941) (dictum); John Hancock Mutual Life Ins. Co. v. Casey, 139

F.2d 207 (1st Cir. 1943); Sheridan View Bldg. Corp., 154 F.2d 1008 (7th Cir. 1946). In Matter of Centralia Refining Co., 35 F.Supp. 599 (E.D.Ill.1940) the Court held that administrative expenses were not to be charged against secured assets even though the consequence of that decision was to leave trustee, accountants and attorneys unpaid.

In the instant case, however, Judge Arraj's rulings in the course of the Chapter X proceedings had the effect of imposing on the secured creditor the burden of paying very nearly the entire costs of the reorganization proceedings, despite the fact that the secured creditor doggedly opposed their institution, did not cause them to be instituted, did not benefit therefrom, and did not, for itself, foresee any possible benefit therefrom at any time. However, even in the view we take of the transaction, which is that costs and expenses were charged against S.B.A., it can not be concluded that this action was invalid. See In re Riddlesburg Mining Company, supra, 224 F.2d 834 (3rd Cir. 1955), wherein certain unsecured creditors filed a petition for reorganization of the debtor company which was opposed by the secured creditors. The district court approved the petition, appointed a trustee, and enjoined certain secured creditors from proceeding with foreclosure action in the state court. As was later revealed reorganization was impossible. The secured creditors appealed from the order of the district court which found that the unsecured creditors had presented a good faith petition for reorganization; appointed a trustee; and enjoined the foreclosure action. The appellants' main argument was that it was not reasonable at any time to expect that a plan of reorganization could be formulated, and that, therefore, under Section 146 of the Bankruptcy Act, Title 11 U.S.C. § 546, the petition should have been dismissed. The Court of Appeals for the Third Circuit said:

"The issue raises questions of fact * * *. The value of the assets when the petition was filed was an important determination with regard to possible reorganization. Opinions as to the value of the assets, which had been considered very valuable a few years prior to the filing of the petition, were contradictory and varied greatly.

"From this difference of opinion as to the debtor's assets and the extent of its liabilities the district court concluded that a reasonable chance of reorganization existed. The perspective of hindsight does not, of course, affect the original determination that reorganization was reasonably possible and cannot provide a basis for reversing the district court." 224 F.2d at 836

The appellants also argued that it would be inequitable to pay the administration expenses from the proceeds of the mortgaged premises to the detriment of the mortgage creditors in view of the fact that the mortgage creditors at all times actively fought for the dismissal of the reorganization proceeding. To this argument the Court said:

"Section 246 of the Bankruptcy Act, 11 U.S.C.A. § 646, gives the judge authority to allow reasonable compensation for administration expenses incurred during a reorganization attempt. There is no limitation with regard to secured or unsecured assets. Whether, and to what degree, the mortgage creditors should run a risk of loss in order to make possible a reorganization was wholly within the discretion of the district judge, who properly exercised his discretion." 224 F.2d 837.

### III.

■■ Proceeding then on the basis that the expenses of reorganization were validly charged to the secured creditor in the instant case, it remains to be determined whether the fact that the secured creditor retained less than the amount of the note which was secured by collateral *after* payment of the expenses of reorganization from the proceeds of the forced sale of the collateral entitles the S.B.A. as a secured creditor to pro-

ceed against the individual guarantors of the note. We conclude that the secured creditor is not entitled to recover from the guarantors the costs and expenses of the Chapter X proceedings as distinguished from expense of preserving the collateral. We conclude that the underlying debt represented by the note, payment of which was guaranteed by the individual defendants, was substantially discharged when the property which was security for the debt was sold to the S.B.A. for $250,000.00. The fact that the secured creditor, the S.B.A., was thereafter obliged to pay nearly one-half of that amount for expenses of the antecedent reorganization proceedings is immaterial, in our view, to a determination of the liability of the guarantors. The guarantors did not guarantee that the secured creditor would clear $250,000.00. Their basic guarantee extended only to payment of any deficiency up to the amount of $250,000.00 if, but only if, the debtor failed to do so; or, more importantly, if the property securing the debt sold for less than $250,000.00. But the property did sell for $250,000.00! The secured creditor was the purchaser. To be sure, an unanticipated amount of reorganization expenses had to be paid from the proceeds of that sale, but that liability is a burden which was imposed on the secured creditor. It can not be passed on by S.B.A. to the guarantors. Under no stretch of their obligations could they be called on for these extraordinary costs and expenses.

The transaction which actually took place wherein the S.B.A. paid net, in cash, only the amount of the expenses of reorganization, $111,850.31, and credited against its lien the balance of the amount of its $250,000.00 bid at auction, $138,149.69, was adopted, as has been noted, as a substitute for an equivalent transaction in which the trustee contemplated that the S.B.A., as buyer, would pay $250,000.00 in cash to the trustee. Had this been done the trustee would then have paid the expenses of administration, $111,850.31, and a sum of $138,149.69 would have been remitted to the

secured creditor—the S.B.A. acting in another role. The fact that the secured creditor would have received only $138,149.69 on its lien of some $242,000.00 does not indicate that sale of the collateral at auction produced less than enough to discharge the guarantors. Manifestly, the collateral sold for at least $250,000.00, and recovery of that amount by the trustee essentially discharged the liability of the guarantors.

It is argued by the secured creditor that certain language in the note and guaranty indicates an agreement on the part of the guarantors to insure that the secured creditor would *clear* $250,000.00 from the forced sale of the collateral.

The note of Durox does provide:

"Upon the nonpayment of the indebtedness * * * Payee is empowered to sell * * * the Collateral * * * After deducting all expenses incidental to or arising from such sale or sales, Payee may apply the residue of the proceeds thereof to the payment of the Indebtedness * * * returning the excess, if any, to the undersigned."

It is true, of course, that expenses incidental to or arising from the sale, such as auctioneers' fees, are chargeable to the debtor; but this provision does not contemplate that the expenses of reorganization which the secured creditor might be obliged to pay are chargeable to the debtor on account of its note—or the guarantors of the note. Such expenses, in our view, are not "expenses incidental to or arising from such sale."

The note of Durox further provides:

"The undersigned agree to take all necessary steps to administer, supervise, preserve, and protect the Collateral * * * The undersigned shall pay all expenses of any nature * * * which Payee may deem necessary or proper in connection with the satisfaction of the Indebtedness or the administration, supervision, preservation, protection (including, but not limited to, the main-

tenance of adequate insurance) of or the realization upon the Collateral. Payee is authorized to pay at any time * * * any or all of such expenses, add the amount of such payment to the amount of the Indebtedness, and charge interest thereon at the rate specified herein with respect to the principal amount of this Note."

■ It is true that expenses incidental to preservation and protection of the collateral, such as insurance, are chargeable to the debtor; but this provision contemplates something other than expenses of reorganization. As both the S.B.A. and the guarantors rightly argue, many, perhaps most, expenses of this reorganization had to do with matters other than the administration, supervision, preservation and protection of the property securing the note. The vast bulk of the expenses of reorganization in this case, in our view, are not rightly cognizable as expenditures the object of which was the satisfaction of the indebtedness represented by the note, or the administration, supervision, preservation and protection of the collateral, or realization thereupon. Judge Arraj's order, in our view, does not embody a contrary finding. His determination was that the expenses of reorganization, whether related to preservation of the collateral or not, should be paid by the secured creditor from the proceeds of the sale of the collateral.

The guaranty signed by each of the defendants does nothing more than acknowledge the liability of the individual guarantors for the principal of the note, interest thereon, and the expenses, examined above, which might be incurred in connection with the sale of the collateral or its preservation. As we have noted, the vast bulk of the expenses of reorganization which the secured credi-

tor was obliged to pay are not expenditures which are covered by the terms of the note or guaranties. They were paid by the secured creditor, albeit with hesitation and following protest; yet, S.B.A. undoubtedly recognized that the Court was empowered to assess costs and expenses against it. Thus, by undertaking to pay these expenses S.B.A. merely recognized the inevitable. It gave nothing away which it could not have been obliged to pay. The guarantors are not now obligated by the terms of the guaranties which they signed to reimburse the secured creditor, the plaintiff here, for any amounts other than the expenses directly connected with the auction sale of the property and that minimal portion of the expenses of reorganization, the immediate object of which was the preservation of the collateral.

On the basis of data now before the Court it is not possible to determine exactly the amount of the guarantors' liability on a deficiency.

The guarantors' liability consists of:

(1) The amount of principal balance as of February 6, 1959, plus interest thereon;

(2) The costs and expenses directly attributable to preservation of the collateral, including insurance of the property (and interest on the amount of the premium), repair of the property, and local property taxes; and

(3) The expenses directly connected with the auction sale, including the auctioneer's fee, which appears to have been $6,250.00. From the sum of these amounts is to be deducted the amount of $250,000.00 to determine the deficiency for which the guarantors are now liable.

The parties are directed to prepare an order embodying the foregoing analysis and conclusions. If agreement cannot be reached as to the amount, the matter will be set for further hearing.